## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINE MORABITO, | ) | CASE NO. 1:16CV2414 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Christine Morabito ("Plaintiff" or "Morabito"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be VACATED and the case REMANDED

for further proceedings consistent with this decision.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

## I.    PROCEDURAL HISTORY

In March 2013, Morabito filed an application for POD and DIB, alleging a disability onset date of August 18, 2005 and claiming she was disabled due to "migraines, memory loss, depression, numbness in right arm, neck, lumbar coccyx, severe arthritis, left ankle fusion, bone removal of left hip, high blood pressure, [and] jaw."  (Transcript ("Tr.") 41, 183, 211.)  The applications were denied initially and upon reconsideration, and Morabito requested a hearing before an administrative law judge ("ALJ").  (Tr. 41, 124-130, 135.)

On May 14, 2015, an ALJ held a hearing, during which Morabito, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 55-94.)  On June 26, 2015, the ALJ issued a written decision finding Morabito was not disabled.  (Tr. 41-49.)  The ALJ' s decision became final on August 5, 2016, when the Appeals Council declined further review. (Tr. 1-7.)

On September 30, 2016, Morabito filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 14.)  Morabito asserts the following assignments of error:

(1)    The ALJ erred in her decision by failing to follow the treating physician rule.

(2)    The ALJ's RFC finding is not supported by substantial evidence.

(Doc. No. 12.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Morabito was born in December 1965 and was forty-five (45) years-old at the time of her date last insured ("DLI") of June 30, 2011, making her a "younger" person under social security

2

regulations.  (Tr. 48.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  She has a high school

education and is able to communicate in English.  (*Id.*)  She has past relevant work as an x-ray

technician.  (Tr. 48.)

**B.      Relevant Medical Evidence**[2]

The record reflects Morabito was in a severe motor vehicle accident in 1988.  (Tr. 567.)

She was in a coma for three months and  hospitalized for seven months.  (*Id.*)  Morabito suffered

multiple injuries (including fractures of her right elbow, left ankle, and left wrist) and underwent

numerous surgeries.  (*Id.*)  Records reflect that, subsequent to the accident, Morabito suffered

from residual pain in her neck, right upper extremity, left wrist, right foot, left knee, low back,

right sacroiliac joint, and right posterior lower extremity.  (*Id.*)  She treated with pain

management beginning in January 2004 and was prescribed numerous pain medications,

including OxyContin, Keppra, Neurontin, and Mobic.  (Tr. 569.)  Her diagnoses in 2004 and

2005 included chronic pain syndrome, osteoarthritis multiple area, neuropathic pain, sciatic

distribution pain, and status post multiple trauma.  (Tr. 536, 564, 562, 560, 558, 556, 554, 552,

550, 548, 546, 544, 542, 540, 538, 534, 532.)

Despite her chronic pain, Morabito worked full-time as an MRI /x-ray technician

throughout 2004 and until August 2005.  (Tr. 355.)  On August 2, 2005, Morabito injured her

right elbow while removing an obese patient from an MRI machine.  (*Id.*)  She complained of

sharp elbow pain with any kind of motion, and "some minimal pain" radiating down her forearm

and up into her shoulder.  (Tr. 351.)  Examination revealed diffuse tenderness and decreased

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is
limited to the records identified in the parties' Briefs on the Merits.

range of motion.  (*Id*.) X-rays showed (1) an "old healed fracture head of the radius with

ununited fragments lying in the elbow joints;" and (2) soft tissue calcifications due to myositis

ossificans lying adjacent to the lateral aspect of the metaphysis of the right humerus.  (Tr. 355.)

Morabito underwent an MRI on August 10, 2005, which revealed (1) probable secondary post-

traumatic osteoarthritis; (2) joint effusion; (3) moderate to severe tendinosis common extensor

tendon (no complete tear); (4) atrophy of the distal triceps musculature; and (5) mild soft tissue

edema.  (Tr. 371.)

On August 16, 2005, Morabito presented to Thomas E. Parent, M.D., for evaluation of

her right elbow pain.  (Tr. 369.)  Dr. Parent noted the MRI showed "severe tendinitis of the

common extensor."  (*Id*.)  Examination revealed swelling, tenderness and pain over the common

extensor with limited extension, as well as painful wrist extension and painful long finger

testing.  (*Id*.)  Dr. Parent administered an injection in Morabito's right elbow and gave her "work

restrictions with no use of the right arm."  (*Id*.)  Several weeks later, on August 30, 2005,

Morabito returned to Dr. Parent and reported "her job is not being compliant with her work

restrictions of no use of the arm."  (Tr. 368.)  She reported mild improvement since her injection,

but continued to complain of pain over the lateral aspect of the elbow.  (*Id*.)  Dr. Parent

prescribed an elbow splint and ordered her "off work for one month."  (*Id*.)

On October 14, 2005, Morabito underwent an x-ray of her right elbow, which showed

"degenerative arthritis of the distal humerus and small nodular bony fragment in the anterior

elbow joint on the lateral view also compatible with old trauma."  (Tr. 370.)  She returned to Dr.

Parent several days later, who noted Morabito "is not getting over her elbow injury very well."

(Tr. 366.)  Dr. Parent offered her continued conservative treatment, but indicated she was

"probably headed" to operative intervention.  (*Id.*)  The record reflects Morabito underwent surgery on her right elbow on December 2, 2005, specifically a lateral epicondylar release of the right elbow.  (Tr. 372.)

Meanwhile, during this time period, Morabito regularly presented to pain management physician Paul Arnold, D.O., for treatment of her chronic pain.  (Tr. 515-531.)  Specifically, the record reflects she presented to Dr. Arnold on eight occasions between August and December 2005.  (*Id.*)  On August 10, 2005, she presented with "a great deal of pain bilaterally" in the sacroiliac joints when walking.  (Tr. 530.)  Dr. Arnold noted Morabito "has undergone chiropractic treatment, physical therapy and opioid therapy, all of which have failed."  (*Id.*)  He administered an injection to her sacroiliac ("SI") joint.  (*Id.*)  In subsequent visits, Morabito complained of severe right arm pain as well as increased back pain.  (Tr. 515-529.)  Throughout this time period, treatment notes generally indicated Morabito's activities of daily living were either "limited" or "not possible."  (Tr. 528, 526, 524, 520, 518, 515.)  Dr. Arnold consistently diagnosed torn extensor tendon, chronic pain syndrome, osteoarthritis multiple area, neuropathic pain, sciatic distribution pain, and status post multiple trauma; and prescribed various pain medications including OxyContin, Roxicodone, Baclofen, Keppra, Mobic, Neurontin, Celebrex, Viagra, and Lidoderm patches.  (*Id.*)

On January 24, 2006, Morabito returned to Dr. Parent for evaluation of her right elbow post surgery.  (Tr. 364.)  Dr. Parent noted "she lacks some elbow flexion and some elbow extension," and referred her for physical therapy for three weeks.  (*Id.*)  Morabito returned on March 13, 2006 with complaints of continuing mild to moderate pain.  (Tr. 363.)  Dr. Parent noted as follows:

5

> Her wound looks great.  She is in physical therapy.  I think she is going to
> need continued therapy with strengthening of the right elbow.  We will be
> able to get her work right now with a 10-pound lifting restriction.

(*Id*.)

On May 24, 2006, Morabito presented to Dr. Parent with reports of "pain over the lateral aspect of her ankle with continued difficulties with crepitation."  (Tr. 362.)  Dr. Parent concluded Morabito "certainly has an ongoing problem with her elbow, that I think she is going to have long-term problems especially with the amount of arthritis that she has developed from previous problems and her operative issues."  (*Id*.)  At this visit, Morabito also complained of dropping objects in her hands.  (*Id*.)  Dr. Parent "could find no cause for [this] in relating to her elbow" and referred her for a neurologic evaluation.  (*Id*.)

The record reflects Morabito continued to regularly present to Dr. Arnold for treatment of her chronic pain.  In January 2006, she complained of increased pain in her right elbow.  (Tr. 513.)  Dr. Arnold noted elevated blood pressure (at 190/110) and started her on hypertension medication.  (*Id*.)  The following month, Dr. Arnold noted Morabito's blood pressure remained elevated and changed her medication.  (Tr. 509.)  In March 2006, Morabito's blood pressure was "still up," causing Dr. Arnold to add a beta blocker.  (Tr. 505.)  In April 2006, Morabito's blood pressure was under control but Dr. Arnold noted "her elbow looks bad and she has been released to return to work."  (Tr. 503.)  He did "not feel she can return to moving patients around for x-rays."  (*Id*.)  In May 2006, Morabito complained of continued right elbow pain with paresthesias in her right hand.  (Tr. 501.)  On June 5, 2006, Dr. Arnold noted "Christine's arm still hurts and has marked decrease in function," and "she also has loss of use of her hand."  (Tr. 499.)  At these visits, treatment records generally indicate Morabito was either "unable to perform all the normal

6

activities of daily living with medications" (*see* Tr. 513, 511), or "able to perform limited activities of daily with medications" (*see* Tr. 509, 505, 503, 501, 499.)

Dr.  Arnold also had Morabito complete "Pain Assessment" questionnaires at several visits.  (Tr. 486-498.)  In September 2006, Morabito stated her average pain level for the previous week was 4 out of 10, and her worst pain level was 7 out of 10.  (Tr. 497.)  She reported her pain had been relieved by 50% during the previous week and indicated the amount of pain relief she was obtaining from her current pain relievers was enough "to make a real difference in her life."  (*Id.*)  In October, November and December 2006, Morabito rated her average pain level as ranging between 2 and 4 out of 10, and her worst pain levels as ranging between 7 and 8 out of 10.  (Tr. 494, 491, 489, 486.)  She reported her pain had been relieved by between 50 and 70% during this three month period.  (*Id.*)

Meanwhile, Morabito injured her right thumb in October 2006.  (Tr. 873, 876.)  She was seen in the emergency room where a drain was placed in the wound.  (*Id.*)  In November 2006, she presented with "progressive swelling of the right thumb," as well as chronic pain in that area. (Tr. 873.)  An x-ray revealed "destruction involving the distal aspect of the proximal phalanx and the adjacent joint with considerable soft tissue swelling and some periosteal calcifications as well that are consistent with osteomyelitis."  (*Id.*)  Examination revealed "marked swelling with fluctuance involving the thumb and with considerable erythema, pain and tenderness in this area."  (*Id.*)  Morabito was diagnosed with cellulitis and acute and chronic osteomyelitis of the right thumb, and prescribed antibiotics.  (*Id.*)  The record reflects Morabito underwent a debridement of skin, subcutaneous tissue and tendon, as well as partial excision of bone, on November 14, 2006.  (Tr. 881-882.)

Morabito required IV antibiotics for several weeks after her thumb surgery. (Tr. 430, 933.) On December 11, 2006, she presented to Nicholas Lekas, M.D., who noted Morabito's thumb was warmer and "seems to be more inflamed." (Tr. 933.) On December 15, 2006, Morabito underwent surgery to remove a pin in her thumb. (Tr. 942. ) Morabito was prescribed a thumb immobilizer splint and continued on antibiotics. (Tr. 946.)

On December 28, 2006, Morabito reported she had fallen on Christmas day and injured her right thumb, resulting in "tremendous pain and more swelling." (Tr. 950.) X-rays revealed that "the cement moved somewhat and detached itself from the proximal phalanx area." (*Id*.) The record reflects Morabito underwent another debridement on January 2, 2007. (Tr. 956.)

On January 19, 2007, Morabito returned to Dr. Arnold for a routine pain management recheck. (Tr. 482-483.) She reported her pain had improved by 50%, but also stated she was unable to perform activities of daily living. (*Id*.) Dr. Arnold noted an unsteady gait, painful range of motion in Morabito's lumbosacral and cervical spines, and tenderness to palpation in her SI joint. (*Id*.) Muscle strength and tone were normal. (*Id*.) Dr. Arnold continued Morabito on her medication regimen of OxyContin and Roxicodone. (*Id*.)

On March 23, 2007, Morabito reported her pain had improved by 75% and she was able to perform activities of daily living without difficulty. (Tr. 480-481.) Her gait and station were normal, as was her muscle strength and tone. (*Id*.) However, Dr. Arnold noted painful range of motion in Morabito's lumbosacral spine. (*Id*.) Several months later, on April 17, 2007, Morabito reported pain in her right knee and indicated she was unable to perform her activities of daily living. (Tr. 476-477.) Dr. Arnold noted unsteady gait; inflammation of Morabito's digits and nails; misalignment and asymmetry of her joints and muscles; painful range of motion

8

in her lumbosacral spine; and painful leg extension and flexion.  (*Id.*)  He ordered an MRI of her right knee, and prescribed crutches and a straight leg brace.  (Tr. 477.)

The parties do not direct this Court's attention to any further medical records from 2007. In September 2008,[3] Morabito began treatment with Ibrahim Bshara, M.D.  (Tr. 860.) Morabito's blood pressure was elevated at 160/110, but examination findings appear to have otherwise been normal.  (*Id.*)  Dr. Bshara noted the presence of scars on Morabito's right elbow and left foot and ankle, and indicated she was being followed by pain management and taking OxyContin and OxyCodone. (*Id.*)  He prescribed blood pressure medication.  (*Id.*)  Morabito returned to Dr. Bshara on November 13, 2008 for follow-up regarding her hypertension and history of asthma.  (Tr. 858.)  Dr. Bshara noted Morabito "has been fairly good."  (*Id.*) Examination findings were largely normal, with the exception of "mild scattered wheezes and rhonchi."  (*Id.*)  Dr. Bshara continued Morabito on her hypertension medication, refilled her asthma inhalers, and ordered blood work and a chest x-ray.  (*Id.*)

On January 27, 2009, Morabito underwent x-rays and an MRI of her lumbar spine.  (Tr. 614-616.)  The x-ray showed degenerative changes within the lower lumbar spine, including intravertebral disc space narrowing at L4-L5 and L5-S1 and narrowing and sclerosis in the lower

---

[3] In April 2008, Morabito was hospitalized for "an acute depressive episode with suicidal ideation."  (Tr. 460-469.)  She and her husband had recently moved back to Ohio from Florida, and were having marital problems.  (Tr. 460.)  On examination, Morabito was withdrawn and despondent, with a constricted affect, psychomotor retardation, poor concentration, and limited insight and judgment.  (*Id.*)  Rakesh Ranjan, M.D., diagnosed major depression, recurrent, severe without psychotic features.  (*Id.*)  He assessed a Global Assessment of Functioning ("GAF") of 25 on admission (indicating very serious symptoms) and noted Morabito's highest GAF in the past year was 60.  (*Id.*)  Morabito was placed on suicide precautions and Wellbutrin, and referred for therapy and blood work.  (*Id.*)  The parties do not direct this Court's attention to any further mental health treatment records.

lumbar facet joints.  (Tr. 616.)  The MRI revealed (1) bulging discs at L3-L4, L4-L5, and L5-S1 without superimposed focal herniation; and (2) facet joint hypertrophy at L2-L3, L3-L4 and L4-L5.[4]  (Tr. 615.)

In July 2009, Morabito returned to Dr. Bshara with elevated blood pressure, occasional shortness of breath, and swelling in her bilateral lower extremities.  (Tr. 857.)  Dr. Bshara noted Morabito had been noncompliant with her blood pressure medication.  (*Id*.)  Examination revealed +1 to +2 edema in Morabito's bilateral ankles and feet.  (*Id*.)  He ordered an EKG, which was unremarkable.  (*Id*.)  Dr. Bshara advised Morabito to restart her blood pressure medication, and ordered blood work.  (*Id*.)  In February 2010, Morabito complained of recurrent edema in her lower extremities and hands.  (Tr. 855.)

Morabito returned to Dr. Bshara on June 12, 2010 with complaints of multiple pains and aches, including pain in her left leg, right elbow, and right thumb.  (Tr. 852.)  She indicated her pain management doctor had quit recently and she was assigned to another doctor, who she was scheduled to see the following month. (*Id*.)  Morabito indicated she was running short on her pain medication and asked for Percocet for "temporary management."  (*Id*.)  Dr. Bshara noted Morabito had been anxious and in pain.  (*Id.*)  Her blood pressure was elevated at 160/90.  (*Id*.)  Dr. Bshara prescribed Percocet, and advised Morabito to schedule an appointment with pain management.  (*Id*.)

Two weeks later, on June 24, 2010, Morabito returned to Dr. Bshara with complaints of persistent and chronic pain in her right upper extremity.  (Tr. 850.)  Dr. Bshara noted as follows:

---

[4] This imaging appears to have been ordered by Mark Allen, M.D.  (Tr. 614-616.) The parties, however, do not direct this Court's attention to any treatment records from Dr. Allen, either pre or post-dating these imaging results.

"She is having problem with the pain management.  Her pain management doctor has left and she needs oxycodone and OxyContin.  I had referred her to pain management specialist in the past but apparently they would not see her until August 2010."  (*Id*.)  Dr. Bshara indicated he would attempt to arrange a pain management appointment for Morabito by telephone and, if unsuccessful, would refill her OxyContin.  (*Id*.)

On July 7, 2010, Morabito began treatment with pain management physician Dean Pahr, D.O.  (Tr. 595-597.)  Dr. Pahr noted Morabito had a "gross distortion" of her right elbow; a fusion with infection that had resolved in her right thumb; "a problem with her left ankle with a fusion procedure;" and back problems.  (Tr. 595.)  On examination, he described Morabito as "a pleasant female with these noted joint problems with the right elbow she cannot fully extend, the right thumb is locked in position, and her left elbow."  (*Id*.)  Dr. Pahr also noted she had "some guarding and protection of her back with some pain behavioring with light touch."  (*Id*.)  He diagnosed lumbar radiculitis; lumbar spondylosis without myelopathy; osteoarthritis, multiple joints; joint pain, multiple locations; and possible fibromyalgia.  (Tr. 595-597.)  Dr. Pahr continued Morabito on OxyContin, Percocet, Flexeril, and Neurontin. (Tr. 597.)

Morabito returned to Dr. Pahr on August 3, 2010.  (Tr. 594, 611.)  The nurse's notes from this visit indicate Morabito complained of pain in her left ankle, lower back, right arm, and thumb, rating it an 8 on a scale of 10.  (Tr. 611.)  Dr. Pahr indicated Morabito was "doing well," in that she "continues to have pain but she continues to make progress with the pain medications."  (Tr. 594.)  He noted she had "obvious deformities" in her elbow and ankle and stated "we can try to help her with the pain that radiates from her back into her legs."  (*Id*.)  The record reflects Dr. Pahr administered lumbar nerve root injections on August 13, August 20, and

11

September 13, 2010.  (Tr. 629, 627, 625.)

On October 15, 2010, Morabito presented to Dr. Pahr "doing somewhat better after her injections."  (Tr. 593.)  The nurse's notes from this visit indicate Morabito complained of pain in her left ankle and lower back, as well as morning stiffness "all over" and difficulty sleeping due to back pain.  (Tr. 610.)  Dr. Pahr diagnosed lumbar radiculitis, lumbar spondylosis without myelopathy, degenerative lumbar disk, and chronic pain syndrome.  (Tr. 593.)  He referred her for physical therapy, indicating "her back is arthritic but it is very nonspecific in the fact that I do believe that she can get past some of her symptoms if she would focus on recovery."  (*Id*.)

Morabito returned to Dr. Pahr on December 10, 2010.  (Tr. 592, 609.)  The nurse's notes from this visit indicate Morabito complained of pain in her left leg, right arm, and lower back, as well as numbness and tingling on her "whole right side" and swelling of her left ankle.  (Tr. 609.)  Morabito indicated she had attended physical therapy twice per week and stated it "helps." (*Id*.)  Dr. Pahr noted Morabito was "doing well" but "continues to have pain, making progress with pain, does not have significant changes in her health other than her pain escalates."  (Tr. 592.)  He continued her on her pain medications and instructed her to follow up with her family physician about her blood pressure, which was elevated.  (*Id*.)  The following month, Morabito returned to Dr. Bshara who started her on Avapro.  (Tr. 849.)

On February 2, 2011, Morabito returned to Dr. Pahr.  (Tr. 591.)  She complained of pain in her right arm and left leg, as well as swelling in her left ankle.  (Tr. 608.)  Morabito indicated she had finished her physical therapy and was using a TENS unit.  (*Id*.)  Dr. Pahr noted Morabito was "doing well" but "continues to have pain." (Tr. 591.)  He stated "the medicines help her a great deal" and "she has done her physical therapy and she does a home exercise program."  (*Id*.)

12

He continued her on her pain medications. (*Id.*)

Morabito returned to Dr. Pahr on March 29, 2011. (Tr. 590.) She again reported pain in her right elbow, left ankle, and lower back, rating it a 9 on a scale of 10. (Tr. 607.) Dr. Pahr noted Morabito "is doing well but some of the benefit from her injections is wearing off." (Tr. 590.) He indicated she had more pain across her back and into her legs, although he did note "her medicines help her a great deal." (*Id.*) Dr. Pahr continued Morabito's pain medications and advised further injections, stating "we could try to keep her functioning, keep her exercising, and hopefully get her back on the work force." (*Id.*) The record reflects Morabito underwent lumbar nerve root injections on May 20, May 27, and June 3, 2011. (Tr. 623, 621, 619.)

On June 27, 2011 (three days prior to her DLI), Morabito returned to Dr. Pahr for follow up regarding her chronic pain. (Tr. 589.) The nurse's notes from this visit indicate Morabito complained of pain in her left ankle, right arm, and lower back, which she rated an 8 on a scale of 10. (Tr. 606.) Morabito also reported numbness and tingling in her right arm and leg; radiating pain from her lower back to her right lower extremity; and morning stiffness in her back and ankle. (*Id.*) She indicated her "ankle [is] biggest area of pain." (*Id.*) Dr. Pahr noted as follows:

> The patient returns to clinic. She continues to work on her pain. She did very well with her injections. She does feel better. She has so many areas of pain. She has had trauma in her ankle and her elbow with some deformity in her thumb and also the back pain, and she has been dependent on opioids for 2 decades.

(Tr. 589.) Dr. Pahr diagnosed (1) ankle joint pain with arthritis secondary to trauma, (2) lumbar radiculitis, (3) lumbar spondylosis without myelopathy, (4) degenerative lumbar disk, and (5) chronic pain syndrome. (*Id.*) He continued her on pain medication regimen. (*Id.*)

13

On September 14, 2011, Dr. Pahr noted Morabito was "doing about the same."  (Tr. 588.) He noted " I have tried to cut back [on the pain medication] as much as I can but with high pain levels and mostly everyday she has significant pain, it is quite difficult." (*Id*.)  On December 7, 2011, Dr. Pahr noted Morabito's "joints are really affecting her.  She has severe levels of pain most days she shows me in her knees and her feet all the traumatic surgeries and the arthritis she has developed and her back condition is still symptomatic as well."  (Tr. 587.)  On examination, Dr. Pahr noted swelling in her right elbow and lower extremities.[5]  (*Id*.)

On April 26, 2013, Dr. Pahr completed a questionnaire regarding Morabito's symptoms and functional limitations . (Tr. 641-642.)  He indicated a diagnosis of "joint pain multiple areas" and described the nature of her condition as "widespread."  (Tr. 642.)  Dr. Pahr noted Morabito was taking OxyContin, OxyCodone, Neurontin, and Flexeril.  (Tr. 641)  With regard to her functional limitations, Dr. Pahr indicated Morabito "would have difficulty sitting and walking at workplace for 8 hours."  (*Id*.)

On January 3, 2014, Dr. Bshara completed a "Medical Assessment of Ability to Do Work-Related Activities (Physical)."  (Tr. 712-716.)  Dr. Bshara concluded Morabito could stand/walk for 1 hour without interruption and for 3 hours total, during the course of an 8 hour work day.  (Tr. 712.)  He described the medical findings supporting this assessment as follows: "severe tenderness and [degenerative joint disease] in lower back, left ankel [sic] & right thumb & elbow."  (*Id*.) Dr. Bshara further opined Morabito could sit for 2 hours without interruption

---

[5] The record also contains numerous treatment notes from 2012 and 2013.  As Morabito is seeking POD and DIB, the Court will not recite this medical evidence post-dating her June 2011 DLI in detail.  Generally, these records document Morabito's continuing complaints of pain in her left ankle, right upper extremity, and lower back.  (Tr. 598-603, 581- 585, 821, 829, 820, 818.)

and for 5 hours total, in an 8 hour workday.  (Tr. 713.)  He identified the basis for this opinion as "tenderness in L-5 spine."  (*Id*.)  Dr. Bshara next concluded Morabito could lift and carry 3 pounds frequently and 5 pounds occasionally, based on "scarring & ankylosis in right elbow and right thumb."  (*Id*.)

In terms of Morabito's postural limitations, Dr. Bshara found she could frequently balance; occasionally stoop and kneel; and never climb, crouch, or crawl.  (Tr. 713.)  He further found she could constantly reach and occasionally handle, finger, and push/pull.  (Tr. 714.)  Lastly, Dr. Bshara opined Morabito had no environmental limitations and no limitations in her ability to understand and carry out simple, detailed, and complex job instructions.  (Tr. 714,716.)

Dr. Bshara stated Morabito's "history & physical" supported his opinion.  (Tr. 715.)  He indicated he had been treating her since July 2013 "with follow up from other physicians" and specifically stated his treatment had been sufficient to form a basis for his assessments.  (*Id*.)  Dr. Bshara found Morabito's conditions had existed since 2002 and opined she was not a malingerer. (*Id*.)

**C.      State Agency Reports**

On June 17, 2013, state agency physician Esberdado Villanueva, M.D., reviewed Morabito's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment for the period between Morabito's August 2005 onset date and June 2011 date last insured.  (Tr. 104-106.)  Dr. Villanueva found Morabito could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of about 6 hours in an 8 hour workday; and sit for a total of about 6 hours in an 8 hour workday.  (*Id*.)  He further concluded Morabito had unlimited push/pull capacity and an unlimited ability to balance.  (*Id*.)

He found Morabito could frequently stoop; occasionally kneel, crouch, crawl, and climb ramps/stairs; and never climb ladders, ropes, or scaffolds.  (*Id*.)  Dr. Villanueva opined Morabito should avoid all exposure to hazardous machinery and heights, but had no visual, communicative or manipulative limitations.  (*Id*.)

On November 15, 2013, state agency physician Steve McKee, M.D., reviewed Morabito's medical records and completed a Physical RFC Assessment for the period between Morabito's August 2005 onset date and June 2011 date last insured.  (Tr. 119-121.)  He reached the same conclusions as Dr. Villanueva.  (*Id*.)

**D.    Hearing Testimony**

During the May 14, 2015 hearing, Morabito testified to the following:

- She lives in a condo with her husband.  (Tr. 60.)  She is right handed.  (*Id.*) She has a driver's license, but rarely drives.  (Tr. 60-61.)  She has had a handicap placard since 1988.  (Tr. 61.)

- She has a GED and obtained a two year degree in radiology.  (Tr. 62.)  She later obtained her MRI license.  (Tr. 61-62.)  She has worked as a radiology, mammography, and MRI technician.  (Tr. 63.)  In these jobs, she regularly lifted 50 pounds.  (Tr. 64.)

- She was seriously injured in a motor vehicle accident in 1988.  (Tr. 61.)  She fractured her wrist and ankle, and was in a coma.  (Tr. 76, 81.)  She has been "on pain management" since 1992.  (Tr. 75.)  Later, in 2006, she injured her arm while moving a 400 pound patient out of an MRI machine.  (Tr. 63.)  She tore her tendon "completely in half."  (*Id*.)

- She applied for jobs after the 2006 injury but did not get any of them.  (Tr. 66-68.)  She almost got a job as a MRI technician in 2009, but they did not hire her because they were afraid for patient safety due to her arm and hand problems.  (Tr. 66-67.)  She also looked for work at Audie's, Burger King, McDonald's, the donut shop, and Circle K.  (Tr. 67.)  She did not get any of these jobs because she was overqualified.  (*Id*.)

- She became very depressed and tried to kill herself in 2009.  (Tr. 72, 83.)

16

- During the time period on and before June 2011 (her date last insured), she suffered from pain in her lower back, right arm, right thumb, and ankle.  (Tr. 64, 69-71, 73, 75-82.)  In 2011, she had difficulty standing, walking and sitting due to her back issues.  (Tr. 78-79.)  At that time, she could not sit for more than one hour at a time before needing to change position.  (Tr.  79-81.) She could lift 10 pounds.  (Tr. 80-81.)  She sometimes used a cane after work to go grocery shopping, etc.  (Tr. 75-76.)  She did not use a cane at work, however, because she did not want to lose her job.  (*Id*.)

- Her arm, thumb, and elbow pain have worsened over time.  (Tr. 69.)  She had surgery on her right hand.  (Tr. 69-70.)  Her doctor wanted to amputate her thumb, but she begged him not to and he implanted a spacer instead.  (Tr. 70.) Her thumb has been swollen and discolored since her surgery.  (Tr. 70-71.) She has not been able to use her hand or thumb since the surgery.  (*Id*.) She cannot bend her thumb.  (Tr. 71, 82.) She drops things and has difficulty grasping things and buttoning her shirt.  (Tr. 82.) She also has had difficulty lifting with her right arm.  (Tr. 76-77.)

- She currently has an infection in her ankle.  (Tr. 65.)  She needs an ankle replacement and "another fusion" surgery.  (*Id*.)  In addition, she suffers from migraines because her jaw was broken in four places. (Tr. 68.)  She has difficulty hearing on one side.  (Tr. 87-88.)

The VE found Morabito had past work as an MRI/x-ray technician (SVP 7, medium but performed as heavy).  (Tr. 85, 303.)  The ALJ then posed the following hypothetical question:

> [P]lease assume we have an individual of the claimant's age and education with the past jobs that you described.  And further assume this individual is limited as follows. * * * I have an individual who could occasionally lift and/or carry including upward pulling 20 pounds, frequently lift and/or carry including upward pulling 10.  The individual could stand and/or walk with normal breaks for about six hours in an eight hour workday, and sit with normal breaks for about six hours in an eight hour workday.  Pushing and pulling, I'm going to make a change there to frequent with right upper extremity.

> You know, this is a little — I don't have a lot— she talked about her left wrist.  I don't have a lot about the left wrist in terms of functional limitations before this date.  But we do know we had thumb surgery and the elbow surgery before this date.  So I, you know, do have some sense.  And she said that the issues have continued since then. So that's why I'm only going to focus on the right at this point in time.  So pushing and pulling are limited to frequent with the right upper extremity.

17

> And then the individual could occasionally climb ramps and stairs, occasionally kneel, crouch, and crawl.  Never climb ladders, ropes, and scaffolds.  No limits in balancing, and I'm going to put stooping in as occasional as well.  This individual should avoid all exposure to hazards such as hazardous machinery and unprotected heights.  And then the individual could frequently handle and finger with the right upper extremity.  And for right now I'll say frequent reaching all directions with the right upper extremity.  I have no visual or – okay.

(Tr. 85, 86-87.)  The ALJ also limited the hypothetical individual to no loud or very loud environments.  (Tr. 89.)

The VE testified the hypothetical individual would not be able to perform Morabito's past work as an MRI/x-ray technician.  (Tr. 89.)  The VE further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as mail clerk (SVP 2, light, unskilled), ticket taker (SVP 2, light, unskilled), and marker (SVP 2, light, unskilled).  (Tr. 89-90.)

The ALJ then asked the following hypothetical questions:

> Q:  Now if I reduced that to sedentary RFC, so that the individual could only lift up to 10 pounds occasionally, stand or walk for approximately two hours per eight hour workday, and sit for approximately six hours per eight hour workday.  Would there still be jobs for that individual?
>
> A:  And we're keeping the manipulative?
>
> Q:  Yes.
>
> A:  I don't think so, Your Honor.  They would require more handling and fingering and reaching.
>
> Q:  And even there, I had it frequent handling and fingering, right, with the right upper extremity, and frequent reaching all directions?
>
> A:  Yes, Your Honor.

(Tr. 91.)

18

The ALJ then asked "[i]f, you know, the use of the arm, if the need to change position, if pain interferes with attention, concentration, persistence, and pace, if that would cause an individual to be off task, at what point does that become job prohibitive?"  (Tr. 92.)  The VE testified anything above 15% off-task would be job prohibitive.  (*Id.*)

Morabito's attorney then asked as follows:

Q:      So assuming hypothetical number one but changing the push, pull, and the frequent fingering of the right upper extremity, changing that to occasional, would any of those jobs apply?

A:      No, they would not.

Q:      Okay.  And then assuming hypothetical number one but the claimant had testified, in 2011, she believed she could only lift the maximum of 10 pounds.  So with that restriction, would any of those jobs apply?

A:      No.

BY THE ADMINISTRATIVE LAW JUDGE:

Q:      There would be no jobs, you'd be in the sedentary category again, is that correct?

A:      Right.  If we're keeping the same limitations for the extremities.

Q:      So I mean if she could only – if she could still stand and walk six out of eight– stand, sit and walk six out of eight but could only lift up to 10?

A:      That would reduce it to sedentary, Your Honor * * * with the lifting.

Q:      But one-armed in the sedentary, that would be basically then– we wouldn't be able to do that, right?

A:      Right.

(Tr. 93.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the

claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Morabito was insured on her alleged disability onset date, August 18, 2005, and remained insured through June 30, 2011, her date last insured ("DLI.")  (Tr. 41.)  Therefore, in order to be entitled to POD and DIB, Morabito must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on June 30, 2011.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 18, 2005 through her date last insured of June 30, 2011 (20 CFR 404.1571 *et seq*.)

3.    Through the date last insured, the claimant had the following severe impairments: osteomyelitis of the right thumb, right carpal tunnel syndrome, tear of the right extensor tendon, chronic pain syndrome, neuropathic pain, sciatic distribution pain, degenerative disc disease of the lumbar spine, osteoarthritis of the left ankle, lateral epicondylar release of the right elbow (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

21

5.      After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b)[6] with the following additional limitations.  The claimant could frequently push and pull with the right upper extremity.  The claimant could occasionally climb ramps and stairs, but could never climb ladders, ropes, or scaffolds.  The claimant could occasionally kneel, crouch, crawl, and stoop.  The claimant must have avoided all exposure to hazardous machinery and unprotected heights.  The claimant could frequently handle and finger with the right upper extremity.  The claimant could frequently reach in all directions with the right upper extremity.  The claimant could not have worked in any loud or very loud environments.

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on December * * * 1965 and was 45 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that

---

[6]  "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b).  Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

(Tr. 41-49.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another

conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White*, 572 F.3d at 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI.  ANALYSIS

***Treating Physician Opinions***

In her first assignment of error, Morabito argues the ALJ failed to articulate good reasons for discounting the opinions of treating physicians Drs. Parent, Arnold, and Bshara.[7] (Doc. No. 12.)  The Commissioner asserts the ALJ properly considered each of these three medical opinions.  (Doc. No. 14.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[8]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[9]  *See also Gayheart*,

---

[7] In her Brief, Morabito argues the ALJ "failed to give appropriate weight to the medical opinions of Plaintiffs' **four** treating physicians, thus violating the treating physician rule and 'good reasons' requirement."  (Doc. No. 12 at 10) (emphasis added).  However, Morabito limits her substantive argument to challenging the ALJ's weighing of **three** treating source opinions; i.e., the opinions of Drs. Parent, Arnold, and Bshara.  Thus, the Court confines its review to the ALJ's discussion of these three medical opinions.

[8] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[9] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the

710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

       If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good

---

relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Svcs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

### Dr. Bshara

Morabito argues the ALJ erred in assigning "little persuasive effect" to Dr. Bshara's June 2014 opinion. (Doc. No. 12 at 13.) She maintains remand is required because the ALJ rejected Dr. Bshara's opinion on the grounds "he does not appear to have ever treated with the

claimant prior to the date last insured of June 30, 2011" when, in fact, the record reflects Dr. Bshara began treating Morabito in September 2008.  (*Id*.)  Moreover, Morabito asserts that "during the relevant period, [Dr. Bshara] treated her for conditions including chronic pain, uncontrolled hypertension due to pain, and edema in her hands and bilateral lower extremities, and he prescribed opioid medications due to the severity of her pain."  (*Id*. at 14.)  Because the ALJ based her rejection of Dr. Bshara's opinion on the erroneous conclusion that he failed to treat Morabito during the relevant time period, Morabito asserts the ALJ failed to provide "good reasons" and this matter should be remanded for further consideration of his opinion.

The Commissioner acknowledges the ALJ incorrectly stated Dr. Bshara had not examined Morabito prior to her DLI.  (Doc. No. 14 at 11.)  She maintains, however, "the ALJ's underlying rationale remained sufficiently sound, even if the statement regards treatment dates were not fully accurate."  (*Id*.)  Specifically, the Commissioner asserts that, when Dr. Bshara indicated in his opinion that he had treated Morabito since July 2013, he "must have meant that he did not treat Plaintiff for her allegedly disabling conditions prior to July 2013."  (*Id*. at 12.)  The Commissioner thus maintains "the ALJ's apparent reliance on Dr. Bshara's statement that he had begun to treat Plaintiff after the date last insured constituted a sufficient reason for giving his opinion less weight." (*Id*.)

As discussed *supra*, the record reflects Morabito began treatment with Dr. Bshara in September 2008.  (Tr. 860.)  Treatment notes indicate Dr. Bshara treated Morabito for a variety of issues, including elevated blood pressure, asthma, edema, and pain.  (Tr. 860, 858, 857, 852, 850.)  In January 2014, Dr. Bshara submitted an opinion regarding Morabito's physical functional limitations.  (Tr. 712-716.)  He concluded Morabito could stand/walk for 1 hour

without interruption and for 3 hours total, in an 8 hour work day.  (Tr. 712.)  He described the medical findings supporting this assessment as follows: "severe tenderness and [degenerative joint disease] in lower back, left ankel [sic] & right thumb & elbow."  (*Id.*) Dr. Bshara also opined Morabito could sit for 2 hours without interruption and for 5 hours total, in an 8 hour workday.  (Tr. 713.)  He identified the basis for this opinion as "tenderness in L-5 spine."  (*Id.*) Dr. Bshara next concluded Morabito could (1) carry 3 pounds frequently and 5 pounds occasionally, based on "scarring & ankylosis in right elbow and right thumb;" (2) frequently balance; (3) occasionally stoop and kneel; (4) never climb, crouch, or crawl; (5) constantly reach; and (6) occasionally handle, finger, and push/pull.  (Tr. 713-714.)

Dr. Bshara stated Morabito's "history & physical" supported his opinion.  (Tr. 715.) He indicated he had been treating her since July 2013 "with follow up from other physicians" and specifically stated his treatment had been sufficient to form a basis for his assessments.  (*Id.*) Dr. Bshara found Morabito's conditions had existed since 2002 and opined she was not a malingerer.  (*Id.*)

The ALJ weighed Dr. Bshara's opinion as follows:

> * * * I give little persuasive effect to the opinion of treating physician Dr. Ibrahim Bshara, M.D., because his opinion concerning the claimant's functional abilities dates to January 3, 2014, and he does not appear to have ever treated with the claimant prior to the date last insured of June 30, 2011 (14F).

(Tr. 47.)

The Court finds the ALJ failed to articulate "good reasons" for rejecting Dr. Bshara's opinion.  As Morabito correctly notes, the ALJ's sole reason for discounting Dr. Bshara's opinion is simply inaccurate.  Specifically, while the ALJ was under the impression Dr. Bshara

29

did not treat Morabito prior to her June 30, 2011 DLI, the record reflects Morabito began treatment with Dr. Bshara in September 2008 and saw him on at least eight (8) occasions between that date and June 30, 2011.  (Tr. 849, 850, 852, 855, 856, 857, 858, 860.)  Moreover, Dr. Bshara's treatment notes reflect he was well aware of Morabito's chronic pain.  In September 2008, he noted the presence of scars on Morabito's right elbow and left foot and ankle and indicated she had been prescribed OxyContin and OxyCodone by pain management. (Tr. 860.)  In July 2009, Dr. Bshara noted swelling in both of Morabito's lower extremities and indicated she had had left ankle surgery.  (Tr. 857.)  On June 12, 2010, Dr. Bshara treated Morabito for "multiple pains and aches," including pain in her left leg, right elbow, and right thumb.  (Tr. 852.)  He noted she "has been anxious and in pain."  (*Id.*)  The record reflects he prescribed Percocet until she could establish care with a pain management specialist.  (*Id.*)  On June 24, 2010, Morabito returned to Dr. Bshara with complaints of persistent and chronic pain her right upper extremity.  (Tr. 850.)  Thus, the ALJ's sole reason for discounting Dr. Bshara's opinion was based on the false premise that he had not treated her during the relevant time period, and does not constitute a "good reason" for purposes of the treating physician rule.

The Commissioner emphasizes that Dr. Bshara indicated in his opinion he had treated Morabito since July 2013, and argues "Dr. Bshara must have meant that he did not treat Plaintiff for her allegedly disabling conditions" prior to that date.  (Doc. No. 14 at 12.)  The Court rejects this argument.  As set forth above, Dr. Bshara's treatment notes reflect he was cognizant of Morabito's chronic pain and did, in fact, treat her for pain on several occasions prior to July 2011.  (Tr. 852, 850.)  Given this treatment history, the Court is not persuaded Dr. Bshara's opinion should be interpreted as meaning he did not treat Morabito for her allegedly disabling

30

conditions prior to July 2013.  To the contrary, this notation could just as easily have been the product of human error.

Moreover, the ALJ did not provide this as a reason for discounting Dr. Bshara's opinion.  Rather, the ALJ rejected this opinion on the grounds Dr. Bshara "does not appear to have *ever* treated with the claimant prior to the date last insured of June 30, 2011."  (Tr. 47) (emphasis added).  It is well-established the Commissioner cannot cure a deficient opinion by offering explanations never offered by the ALJ.  As courts within this District have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration."  *See, e.g., Blackburn v. Colvin*, 2013 WL 3967282 at * 8 (N.D. Ohio July 31, 2013); *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012).  Here, the ALJ did not state that she interpreted Dr. Bshara's opinion to mean he did not begin treating Morabito for her allegedly disabling conditions until July 2013.  To the contrary, the ALJ explicitly (and incorrectly) stated Dr. Bshara had *never* treated Morabito prior to her June 2011 DLI.

The Commissioner next argues "this Court should not evaluate Dr. Bshara's opinion under the special regulations applicable only to medical opinions from treating sources."  (Doc. No. 14 at 12.)  She notes "other physicians" were treating Morabito for her chronic pain, and maintains "Dr. Bshara's pre-2013 examinations were not consistent with the type of treatment or evaluation required for Plaintiff's orthopedic impairments."  (*Id.*)  The Commissioner argues the regulations imply a treating source "should have treated the claimant for the impairment in question."  (*Id.* at 13.)  Because pain management specialists were primarily responsible for

31

treatment of Morabito's chronic leg and right upper extremity pain, the Commissioner argues "Dr. Bshara's pre-2013 treatment of Plaintiff's orthopedic conditions . . . . did not provide him with a longitudinal view of those conditions from 2005 through the date last insured in 2011." (*Id*.)

The Court rejects this argument.  As noted above, while Dr. Bshara was not a pain management specialist, the record reflects he examined Morabito on eight (8) occasions prior to her June 2011 DLI and was fully aware of her prior motor vehicle accident, previous surgeries on her ankle and right arm, and chronic pain complaints.  Several of Dr. Bshara's treatment notes expressly document pain in Morabito's left leg, right upper extremity and right thumb, and reflect that he prescribed her narcotic pain medication.  (Tr. 852, 850.)  Thus, the Court does not agree with the Commissioner that Dr. Bshara lacked a longitudinal view of Morabito's orthopedic conditions during the relevant time period.

Moreover, while specialization (or the lack thereof) is a factor an ALJ can consider in determining the weight to accord a treating physician opinion, the ALJ in the instant case did not cite Dr. Bshara's lack of specialization as a basis for discounting his opinion.  Nor did the ALJ state Dr. Bshara's opinion was entitled to less weight because he was not sufficiently familiar with Morabito's chronic pain conditions or because those conditions were beyond Dr. Bshara's area of expertise.  Defense counsel's *post hoc* rationale cannot provide "good reasons" for rejecting a treating physician opinion.  *See Schultz v. Comm'r of Soc. Sec.*, 2016 WL 4577049 at * 6 (E. D. Mich. Aug. 10, 2016) ("But Defendant's *post-hoc* rationalization of the ALJ's assessment of Drs. Kazmers and Rao's opinions does not cure the ALJ's failure to provide good reasons."); *Johnson v. Comm'r of Soc. Sec.,* 193 F.Supp.3d 836, 847 (N.D. Ohio 2016) ("[T]he

Commissioner's *post hoc* rationalization for discounting Dr. Smarty's opinion is contrary to the law of Sixth Circuit.  While. . . there are portions of Dr. Smarty's treatment notes showing that Plaintiff's condition had improved and was, in some respects, normal. . . , the ALJ did not cite this evidence as a basis for rejecting Dr. Smarty's opinion.  Rather, this explanation appears for the first time in the briefing now before the Court.  This Court 'may not accept appellate counsel's *post hoc* rationalizations for agency action.'") (quoting *Berryhill v. Shalala*, 4 F.3d 993, 1993 WL 361792 (6th Cir. 1993)).

The Commissioner next maintains remand is not required because it is not clear whether Dr. Bshara's opinion that Morabito's "conditions" have existed since 2002, relates to the duration of her underlying medical conditions or to the duration of her functional limitations.  (Doc. No. 14 at 13.)  She asserts "if the question referred to the underlying medical conditions only, then the opinion's functional limitations were not endorsed as applicable to the period prior to the date last insured."  (*Id.*)  Once again, however, there is no indication the ALJ interpreted Dr. Bshara's opinion in such a fashion.  The ALJ did not articulate this as a basis for rejecting Dr. Bshara's opinion and the Court cannot engage in any of the various *post hoc* rationalizations suggested by the Commissioner.  This argument is, therefore, without merit.

Finally, the Commissioner argues Dr. Bshara's opinion was "so patently deficient that the Commissioner could not possibly credit it."  *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 547 (6th Cir. 2004).  In *Wilson*, the Sixth Circuit held that the reason-giving requirement is mandatory, but suggested there may be circumstances where a failure to give good reasons is harmless error.  As stated in *Wilson*,

> That is not to say that a violation of the procedural requirement of § 1527(d)(2) could never constitute harmless error.  We do not decide the question of

whether a *de minimis* violation may qualify as harmless error.  For instance, if a
treating source's opinion is so patently deficient that the Commissioner could
not possibly credit it, a failure to observe § 1527(d)(2) may not warrant reversal.

*Id*. at 547.  *See also Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011); *Nelson v. Comm'r of Soc.

Sec.*, 195 Fed. Appx. 462, 470–471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.*, 148 Fed. Appx.

456, 464 (6th Cir. 2005).  In the present case, the Commissioner argues Dr. Bshara's opinion is

patently deficient because "the assertion that Plaintiff could not lift more than 5 pounds

occasionally or 3 pounds frequently since 2002, and could stand/walk only three hours in a

workday since then, is contradicted by the fact that Plaintiff was working full-time (including

overtime) as an x-ray technician through August 2005." (Doc.  No. 14 at 13-14.)

The Commissioner is correct that Morabito worked full time up until her onset date of

August 18, 2005, when she injured the tendon in her right arm moving a patient out of an MRI

machine.  However, the record reflects that, shortly after her 2005 injury, Morabito stopped

working and consistently complained of pain in her right arm, lower back, and left ankle, both to

her pain management physicians and to Dr. Bshara.[10]  Moreover, Dr. Bshara's opinion was not

without explanation or support.  *See May v. Astrue*, 2009 WL 4716033 at *8 (S.D. Ohio 2009)

(finding opinion patently deficient where source simply checked boxes about plaintiff's grasping

ability and failed to provide supporting explanations or objective evidence).  To the contrary, Dr.

Bshara explained that he based his (1) stand/walk limitations on Morabito's presentation of

"severe tenderness and [degenerative joint disease] in lower back, left ankel [sic] and right

---

[10]  To the extent Dr. Bshara's opinion relates to the period prior to September 2008 (the
date he began treating Morabito), the Court agrees it is of questionable relevance.
However, once again, the ALJ did not articulate this as a basis for rejecting Dr. Bshara's
opinion and the Court cannot engage in *post hoc* rationalizations to support the ALJ's
decision to accord "little persuasive weight" to Dr. Bshara's opinion.

thumb and elbow;" (2) his sitting limitations on "tenderness in L-5 spine," and (3) his

lifting/carrying restrictions on ankylosis in Morabito's right elbow and thumb.  (Tr. 712-713.)

These medical findings are supported by Dr. Bshara's own treatment notes documenting pain in

Morabito's left leg, right elbow, right thumb, and right upper extremity (Tr. 850, 852), as well as

the treatment notes of pain management specialist Dr. Pahr.  (Tr. 589-595, 606-611.)  They are

also consistent with the January 2009 MRI of Morabito's lumbar spine which showed (1)

bulging discs at L3-L4, L4-L5, and L5-S1; and (2) facet joint hypertrophy at L2-L3, L3-L4 and

L4-L5.[11]  (Tr. 614-615.)  In sum, Dr. Bshara's opinion "is not so totally off the mark that the ALJ

should have felt free to almost completely ignore it."  *Johnson*, 193 F. Supp.3d at 848.

Accordingly, it is recommended the Court find the ALJ failed to provide "good

reasons" for giving Dr. Bshara's opinion less than controlling weight.  It is further recommended

that this matter be remanded to afford the ALJ the opportunity to sufficiently evaluate and

explain the weight ascribed to the limitations assessed by Dr. Bshara.[12]

### Drs. Parent and Arnold

Morabito also argues the ALJ failed to articulate "good reasons" for rejecting the

opinions of treating physicians Drs. Parent and Arnold regarding limitations relating to

Morabito's right arm.  (Doc. No. 12 at 11-13.)  Indeed, Morabito argues the ALJ failed to

---

[11] Additionally, lumbar x-rays taken that date showed degenerative changes within
Morabito's lower lumbar spine, including intravertebral disc space narrowing at L4-L5
and L5-S1 and narrowing and sclerosis in the lower lumbar facet joints.  (Tr. 616.)

[12] This is particularly important in light of the VE's testimony that, if accepted, several of
the functional limitations assessed by Dr. Bshara (such as his standing, walking,
lifting/carrying, handling, fingering, and pushing/pulling limitations) would be work
preclusive.  (Tr. 91, 93.)

acknowledge or discuss either of these doctors' opinions at any point in the decision.  (*Id*.)  She

maintains the ALJ's failure to address these opinions is not harmless error because the

restrictions assessed by both Dr. Parent and Dr. Arnold would render her unemployable,

pursuant to the VE's hearing testimony.  (*Id.*)

As noted *supra*, on March 13, 2006, pain management physician Dr. Parent stated in a

treatment note that "[w]e will be able to get [Morabito] to work right now with a 10-pound

lifting restriction."  (Tr. 363.)  Several months later, in June 2006, Dr. Arnold stated in a

treatment note that "Christine's arm still hurts and has marked decrease in function" and "she

also has loss of use of her hand."  (Tr. 499.)  The ALJ did not expressly address either of these

specific treatment notes in the decision.

The Commissioner maintains Dr. Parent's March 13, 2006 opinion "was not intended as

a permanent restriction" and "did not address the question before the ALJ– that is, whether

Plaintiff was disabled until and through June 30, 2011."  (Doc. No. 14 at 8.)  She further argues,

summarily, that Dr. Parent's opinion is deficient because "the imposition of a long-term 10-

pound lifting limit predicated on an impairment affecting only one upper extremity is

unsupportable."  (*Id*. at 9.)  With respect to Dr. Arnold, the Commissioner asserts his May 2006

statement that Morabito had a marked decrease in function of her right arm and loss of use of her

hand dopes not constitute a "medical opinion" because it was a recitation of Morabito's own

subjective complaints rather than Dr. Arnold's own conclusions.  (*Id*.)  She also argues his

statement is inconsistent with Dr. Arnold's own treatment notes and, further, that it lacks

specificity.  (*Id*. at 10.)

The Court finds the ALJ should evaluate Dr. Parent's March 13, 2006 opinion on

remand.  As noted above, Morabito presented to Dr. Parent on seven (7) occasions between August 2005 and May 2006 for evaluation of her right elbow pain.  (Tr. 369, 368, 366, 365, 364, 363, 362.)  After an MRI showed "severe tendinitis," Dr. Parent performed surgery on Morabito's right elbow in December 2005.  (Tr. 369, 372.)  In March 2006, Dr. Parent concluded Morabito needed continued physical therapy and indicated she could return to work "with a 10-pound lifting restriction."  (Tr. 363.)  Two months later, Dr. Parent indicated Morabito "certainly has an ongoing problem with her elbow, and I think she is going to have long-term problems especially with the amount of arthritis that she has developed from previous problems and her operative issues."  (Tr. 362.)

The ALJ does not discuss Dr. Parent's opinion that Morabito should be restricted to lifting 10 pounds at any point in the decision.[13]  This omission is significant as the VE testified there would be no jobs if a restriction to lifting only 10 pounds occasionally were added to the ALJ's hypothetical.  (Tr. 93.)  While the Commissioner suggests Dr. Parent's opinion "was not intended as a permanent restriction" and "did not address . . . whether Plaintiff was disabled until

---

[13] The ALJ did address a workers' compensation determinated dated March 13, 2006 (the same date of Dr. Parent's treatment note), as follows: "I also take away little persuasive effect from the workers compensation determination of March 13, 2006 stating the claimant was then released to light work (18F2).  While such a determination does not support a finding of disability in this matter, it predates the date last insured by five years and does not address reasonably established handling, fingering, and reaching restrictions prior to June 30, 2011." (Tr. 47.)  The Court finds this discussion does not demonstrate that the ALJ reviewed and considered Dr. Parent's March 2006 opinion.  The ALJ does not identify Dr. Parent or discuss his treatment of Morabito in the passage above, and the exhibit referenced (Exh. 18F2) (*i.e.,* Tr. 750) is not Dr. Parent's March 2006 treatment note.  Rather, that Exhibit consists of a one page "Notice of Action/Change" from the Division of Workers' Compensation, which does not explicitly reference Dr. Parent.  (Tr. 750.)

and through June 30, 2011," the ALJ did not articulate these reasons as a basis for discounting

Dr. Parent's opinion.  As has been noted several times above, defense counsel's *post hoc*

rationale cannot provide "good reasons" for rejecting a treating physician opinion.  *See Schultz*,

2016 WL 4577049 at * 6; *Johnson*, 193 F.Supp.3d at 847;  *Blackburn*, 2013 WL 3967282 at * 8;

*Cashin*, 2013 WL 3791439 at * 6; *Jaworski*, 2012 WL 253320 at * 5.

The Commissioner argues, summarily, that Dr. Parent's opinion is patently deficient

because "the imposition of a long-term 10-pound lifting limit predicated on an impairment

affecting only one upper extremity is unsupportable."  (Doc. No. 14 at 9.)  The Court rejects this

argument.  Dr. Parent treated Morabito for her right elbow pain on multiple occasions over a

nine month period, evaluated MRI results regarding her condition, performed her right elbow

surgery, and found she would continue to have "long term problems" with her elbow.  The ALJ

should acknowledge and evaluate Dr. Parent's March 2006 opinion on remand.

The Court further recommends that, on remand, the ALJ should evaluate Dr. Arnold's

June 2006 opinion that "Christine's arm still hurts and has marked decrease in function" and

"she also has loss of use of her hand."  (Tr. 499.)  The ALJ does not discuss Dr. Arnold's

treatment of Morabito at any point in the decision, despite the fact he examined her for her

chronic pain complaints on at least fourteen (14) occasions between August 2005 and June 2006.

(Tr. 499-531.)  The Commissioner argues the ALJ need not have discussed Dr. Arnold's June

2006 opinion because it was merely a recitation of Morabito's own subjective complaints and,

therefore, not a proper medical opinion under 20 CFR § 404.1527(a)(2).  *See e.g., Francis v.*

*Comm'r of Soc. Sec*., 414 Fed. Appx. 802,804 (6th Cir.  2011) ("Dr. Killefer's pain-related

statement, on the other hand, is not a 'medical opinion' at all– it merely regurgitates Francis'

self-described symptoms.")  For the following reasons, the Court does not agree with the Commissioner's characterization of Dr. Arnold's June 2006 treatment note.

Dr. Arnold's June 2006 treatment note is divided into separate sections entitled "Subjective," "Objective," "Assessment," "Plan," "Medications," and "Follow Up."  (Tr. 499.) Dr. Arnold's notations that Morabito had "marked decrease in function" and "loss of use of her hand" are not set forth in the section of the treatment note marked "Subjective" but rather are included as part of the section marked "Plan," which suggests they reflect Dr. Arnold's own conclusions and judgment.  (*Id.*)  Moreover, Dr. Arnold's treatment note does not simply restate the medical evidence underlying Morabito's condition but, rather, discusses her symptoms and offers diagnoses as well as an assessment of her right arm/hand functional capacity.[14]

---

[14] The Sixth Circuit has indicated that, in order to qualify as a "medical opinion" for purposes of social security regulations, a treatment note must reflect a judgment about the nature and severity of the claimant's impairments and discuss the extent of a claimant's functional limitations.  *See e.g., Noto v. Comm'r of Soc. Sec.*, 632 Fed. Appx. 243, fn 1 (6th Cir. 2015) ("In June 2009, Dr. Maltese wrote 'off work indefinitely' on a prescription pad. AR 618.  As the district court aptly observed, we have previously held that this kind of one-sentence note does not qualify as a 'medical opinion' under the Social Security regulations because it does not reflect a judgment about the nature and severity of the claimant's impairments.") (citing *Dunlap v. Comm'r of Soc. Sec.*, 509 Fed. Appx. 472, 476 (6th Cir. 2012)).  *See also Mitchell v. Comm'r of Soc. Sec.,* 330 Fed. Appx. 563, 569 (6th Cir. 2009) (("[T]he regulations and our case law also make clear that before the ALJ must apply the good reasons rule, there must be a genuine assertion by the treating physician of an opinion involving the claimant's 'symptoms, diagnosis, and prognosis.'") *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 n3 (6th Cir. 2009) (noting that statements that do not address the specific extent of limitations "appear to be outside the scope of 'medical opinions' as defined in 20 CFR § 404.1527(a)(2)."); *Montecalvo v. Comm'r of Soc. Sec.*, 2017 WL 2983032 at * 3 (6th Cir. July 13, 2017).  Moreover, courts have found that "medical opinions" need not be contained in a separate document and may be set forth in a physician's treatment notes.  *See e.g., Beardsley v. Comm'r of Soc. Sec.*, 2014 WL 3125128 at * 11 (E. D. Mich. July 8, 2014) ("It is of no consequence that this opinion was contained within his treatment notes rather than in an independent document. There is no requirement in the statute about the form a treating physician's opinion should take, only the content of what it  should contain.");  *Huntington v. Colvin*,

Specifically, the Court finds Dr. Arnold's conclusions that Morabito has "marked decrease in function" of her right arm and "loss of use of her [right] hand" constitutes an assessment of specific physical functional limitations.

While the Commissioner proffers several reasons for discounting Dr. Arnold's opinion, the ALJ did not articulate any such reasons in the decision. Indeed, as noted above, the ALJ did not acknowledge either Dr. Arnold's opinion or his lengthy treatment of Morabito at any point in the discussion of the medical and opinion evidence. The ALJ should acknowledge and evaluate Dr. Arnold's opinion on remand.

### RFC

In her second assignment of error, Morabito argues "[t]he ALJ erred in determining the RFC finding by: (1) failing to consider and evaluate all of the impairments suffered by Plaintiff; (2) improperly substituting her own opinion for those of treating physicians; and (3) failing to consider the types, dosages and side effects of her medications." (Doc. No. 12 at 14.) The Commissioner argues the RFC is supported by substantial evidence in the record. (Doc. No. 14.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the

---

2014 WL 346288 (N.D. Ohio Jan. 30, 2014) ("[S]everal courts have found that treating physician opinions set forth in letters and treatment notes constitute "medical opinions" for purposes of the regulations.") (citing *Winschel v. Comm'r of Soc. Sec*., 631 F.3d 1176, 1179 (11th Cir.2011) (finding treating physician's treatment notes constituted a "medical opinion" for purposes of §§ 404.1527(a)(2) and 416.927(a)(2) and, therefore, ALJ was required to "explicitly consider and explain the weight accorded" to the opinions contained in those notes).

Commissioner." *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, at step two, the ALJ found Morabito suffered from the severe impairments of osteomyelitis of the right thumb, right carpal tunnel syndrome, tear of the right extensor tendon, chronic pain syndrome, neuropathic pain, sciatic distribution pain, degenerative disc disease of the lumbar spine, osteoarthritis of the left ankle, and lateral epicondylar release of the right elbow.  (Tr. 43.)  After determining Morabito did not meet or equal the requirements of a Listing, the ALJ continued at step four to discuss the medical evidence regarding Morabito's

41

right upper extremity, right elbow, lower back, and right ankle.  (Tr. 43-47.)  The ALJ gave

"significant weight" to the opinions of state agency physicians Drs. Villanueva and McKee that

Morabito could perform a reduced range of light work.  (Tr. 47.)  She then gave "limited weight"

to the opinion of Dr. Pahr that Morabito would have difficulty sitting and walking for a total of

eight hours during a typical work day, and "little persuasive effect" to Dr. Bshara's January 2014

opinion regarding Morabito's physical functional capacity.  (*Id*.)

> The ALJ formulated the following RFC:
>
> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following additional limitations.  The claimant could frequently push and pull with the right upper extremity.  The claimant could occasionally climb ramps and stairs, but  could never climb ladders, ropes, or scaffolds. The claimant could occasionally kneel, crouch, crawl, and stoop.  The claimant must have avoided all exposure to hazardous machinery and unprotected heights.  The claimant could frequently handle and finger with the right upper extremity. The claimant could frequently reach in all directions with the right upper extremity.  The claimant could not have worked in any loud or very loud environments.

(Tr. 45.)

As the undersigned has recommended this matter be remanded for further

consideration of the opinions of treating physicians Drs. Bshara, Parent, and Arnold, it is

possible the ALJ's RFC determination may change on remand.  Thus, the Court will not address

all of the parties' arguments regarding the alleged deficiencies in the ALJ's discussion of the

medical evidence at step four.  However, the Court does find ALJ should accord particular

consideration to the following issues on remand.

As Morabito correctly notes, while Morabito's *left* ankle is at issue in this matter and

the ALJ found *left* ankle osteoarthritis to be a severe impairment, the ALJ refers only to

Morabito's *right* ankle in the decision.  (Tr. 43, 47.)  Specifically, the ALJ's entire discussion

regarding Morabito's ankle condition is as follows:

> The claimant's testimony also focused on alleged recurrent pain and
> infections in her right ankle, though her testimony was a bit vague about the
> severity of these alleged symptoms prior to June 30, 2011.  The claimant
> cited an alleged need for ankle replacement in the present, but regardless of
> whether such a surgery is needed, it does not relate back to the period prior to
> the date last insured.  Giving the claimant some benefit of the doubt on this
> point because the arthritis in her ankles does pre-date the date last insured, I
> find that the claimant must have avoided any exposure to workplace hazards
> due to slowed reactions times and movements speeds.

(Tr. 47.)

     At best, it is unclear whether the ALJ considered the medical evidence regarding

Morabito's left ankle pain.  At one point in the above paragraph, she refers to Morabito's right

ankle, while later in the same paragraph she references "the arthritis in [both] her ankles."  (*Id*.)

The ALJ does not discuss any of the medical records relating to Morabito's left ankle pain and

swelling and, further, fails to cite to any exhibits in the record.  Thus, the Court cannot discern

whether the ALJ was aware of and fully considered the medical evidence regarding Morabito's

left ankle condition.

     This is problematic because, as set forth *supra*, the record reflects Morabito

consistently complained of pain and swelling in her left ankle during the relevant time period.

For example, in July 2010, Dr. Pahr noted Morabito had "a  problem with her left ankle with a

fusion procedure."  (Tr. 595.)  The following month, Morabito reported pain in her left ankle

and Dr. Pahr noted she had "obvious deformities" in her ankle.  (Tr. 611, 594.) Morabito again

complained of pain and/or swelling in her left ankle in October 2010, December 2010, February

2011, March 2011, and June 2011.  (Tr. 610, 609, 608, 607, 606.)  Indeed, on June 27, 2011

(three days before her DLI), Morabito complained of pain in her left ankle and indicated her "ankle [is] biggest area of pain."  (Tr. 606.)  On that date, Dr. Pahr noted Morabito had "trauma in her ankle" and diagnosed "ankle joint pain with arthritis secondary to trauma."  (Tr. 589.)  In April 2013, Dr.  Pahr opined Morabito would have difficulty walking for eight hours.  (Tr. 641.)  In January 2014, Dr. Bshara concluded Morabito could stand/walk for no more than 1 hour without interruption and 3 hours total based on her "severe tenderness and [degenerative joint disease] in lower back, **left ankle** & right thumb & elbow."  (Tr. 712) (emphasis added).

The ALJ does not recite or evaluate any of the above medical evidence in the decision, nor (as discussed *supra*) does she discuss Dr. Bshara's January 2014 opinion.  That in combination with the ALJ's puzzling reference to Morabito's "right ankle" makes it unclear whether she was fully aware of and considered the medical evidence regarding Morabito's left ankle condition.  The ALJ should address the medical evidence regarding this issue on remand.

Morabito also argues the ALJ misconstrued the evidence regarding her right arm and hand.  (Doc. No. 12 at 15.)  She argues the ALJ improperly relied on a nerve conduction study performed in 2001 (four years prior to Morabito's onset date) as indicative of only minor functional limitations in Morabito's right arm, and ignored medical evidence that she suffered from numbness, tingling, and pain in her right arm and hand "due to the significant amount of arthritis she developed after tearing the tendon in her right elbow in August 2005 and the subsequent surgery."  (*Id.*)

The ALJ discussed the medical evidence regarding Morabito's right upper extremity as follows:

> In terms of the claimant's alleged complications in her right upper extremity prior to June 30, 2011, the evidence of record does not strongly support the

44

specifics of her allegations.  The claimant alleges that prior to her date last insured, she was effectively unable to use her right upper extremity for any reaching, handling, or fingering due to complications of carpal tunnel syndrome, chronic pain in the elbow, and osteomyelitis of the right thumb. Starting with the injections near her right thumb, the record does reference recurrent struggles with cellulitis and osteomyelitis therein, dating back to 2006 (5F8).  The infections did require the claimant undergo a series of debridement surgeries on the right thumb that appear to have provided some relief for the infections (26F18).  However, outside of the presence of shown infections in the right thumb, physical status examinations showed little of the rigidity and marked loss of functioning in the right hand that the claimant had alleged.  Moreover, a remote nerve conduction study of the right upper extremity performed on February 5, 2001 found only some mild prolongation of the median sensory latency, being suggestive of mild carpal tunnel syndrome (1F1).  Such findings also fail to much support the claimant's allegations because what the claimant has described were wholesale restrictions on the usage of her right hand (see 1F1).  The presence of only mild carpal tunnel syndrome generally is indicative of some minor limitations in handling, fingering, and reaching with the affected upper extremity (see 1F1).  Accordingly and considering the complications in the right thumb, I find that the claimant was limited to but frequent handling and fingering with the right upper extremity prior to June 30, 2011.  I also find that any pain and numbness she experienced in that right upper extremity contributed to an inability to reach more than frequently in any direction with the same.

The claimant further alleged though that an injury suffered to her right elbow on August 2, 2005 further contributed to her perceived loss of function in the right upper extremity (2F7).  The record reflects the claimant injured her right elbow on or about August 2, 2005 in her capacity as an MRI technician (2F7). However, x-rays of the affected joint dated October 14, 2005 showed little impairment other than some degenerative arthritis attributed to a past fracture of the distal humerus (3F9).  That said however, the claimant did appear to suffer an injury to the epicondylar tendon, requiring a release procedure on January 24, 2006 (3F11).  However, by most of the objective accounts in this record, the claimant recovered well from that procedure and had not developed subsequent complications prior to June 30, 2011 (3F3).  Taking all of this evidence into consideration, I find that prior to June 30, 2011 the complications in the claimant's right elbow were accounted for by restrictions to light levels of lifting and carrying, and no more than frequent pushing and pulling, handling and fingering, and reaching with the affected right upper extremity.

(Tr. 46.)

45

In formulating the RFC's limitations relating to Morabito's right upper extremity, the ALJ relied principally on a 2001 nerve conduction study showing mild carpal tunnel syndrome and the conclusion that Morabito had "recovered well" from her right elbow surgery.  (*Id*.)  As Morabito correctly notes, however, the 2001 nerve conduction study was conducted four years prior to Morabito's right tendon injury and surgery.  The record reflects that, subsequent to her surgery, Morabito complained of pain, numbness/tingling, and/or swelling in her right arm/elbow.  For example, in June 2010, Morabito complained of persistent and chronic pain in her right upper extremity.  (Tr. 850.)  In July 2010, Dr. Pahr noted Morabito had a "gross distortion of her right elbow by observation" and "joint problems with the right elbow she cannot fully extend [and] the right thumb is locked in position."  (Tr. 595.)  In August 2010, Morabito complained of pain, numbness and tingling in her right arm and hand, and Dr. Pahr noted "obvious deformities" in her elbow.  (Tr. 594, 611.)  In December 2010, Morabito complained of pain in right arm and numbness/tingling in her right side.  (Tr. 609.)  She again complained of right arm/elbow pain in February, March, and June 2011.  (Tr. 608, 607, 606.)  In June 2011, she also complained of numbness and tingling in right arm, and Dr. Pahr noted Morabito had trauma in her elbow and deformity in her thumb.  (Tr. 606, 589.)

Citing a January 2006 treatment note from Dr. Parent, the ALJ states "by most of the objective accounts in the record, the claimant recovered well from [her right elbow surgery] and had not developed subsequent complications prior to June 30, 2011."  (Tr. 46.)  The ALJ, however, does not acknowledge or discuss the medical evidence noted above.  Moreover, in the January 2006 treatment note relied on by the ALJ, Dr. Parent in fact states Morabito "lacks some elbow flexion and some elbow extension" and refers her to physical therapy.  (Tr. 364.)

In March 2006, Dr. Parent notes Morabito "still has mild to moderate pain" and "she is going to need continued therapy with strengthening of the right elbow." (Tr. 363.) By May 2006, Dr. Parent states Morabito "certainly has an ongoing problem with her elbow, that I think she is going to have long-term problems especially with the amount of arthritis that she has developed from previous problems and her operative issues." (Tr. 362.) Again, the ALJ does not acknowledge or address these post-surgery treatment notes regarding Morabito's right elbow condition.

For all the reasons set forth above, it is recommended that the ALJ should address the medical evidence regarding Morabito's left ankle and right upper extremity condition on remand.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the case REMANDED for further consideration consistent with this decision.

                    /s Jonathan D. Greenberg
                    Jonathan D. Greenberg
                    United States Magistrate Judge

Date: July 24, 2017

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

-